## HCSC–LAUNDRY v. UNITED STATES

No. 80–338.   Decided February 23, 1981

Per Curiam.

Petitioner HCSC–Laundry is a Pennsylvania nonprofit corporation.   It was organized in 1967 under the law of that Commonwealth "[t]o operate and maintain a hospital laundry and linen supply program for those public hospitals and non-profit hospitals or related health facilities organized and

1

operated exclusively for religious, charitable, scientific, or educational purposes that contract with [it]." [1]

Petitioner provides laundry and linen service to 15 non-profit hospitals and to an ambulance service. All these are located in eastern Pennsylvania. Each organization served possesses a certificate of exemption from federal income taxation under § 501 (c)(3) of the Internal Revenue Code of 1954, 26 U. S. C. § 501 (c)(3). [2] Each participating hospital pays petitioner annual membership dues based upon bed capacity. The ambulance service pays no dues. Petitioner's only other income is derived from (a) a charge for laundry and linen service based upon budgeted costs and (b) a charge of 1½ cents per pound of laundry. Budgeted costs include operat-

---

[1] The quoted language is from petitioner's articles of incorporation, as amended May 29, 1970. The articles further state that petitioner's corporate purposes are to be accomplished "in a manner consistent with the provisions of Section 501 (c)(3) of the Internal Revenue Code of 1954." See 624 F. 2d 428, 429, n. 1 (CA3 1980).

[2] Subsections (a) and (c) of § 501, to the extent pertinent here, read:
"(a) Exemption from taxation

"An organization described in subsection (c) or (d) or section 401 (a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

.         .         .         .         .

"(c) List of exempt organizations
"The following organizations are referred to in subsection (a):

.         .         .         .         .

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

ing expenses, debt retirement, and linen replacement. The amounts charged in excess of costs have been placed in a fund for equipment acquisition and replacement.

No part of petitioner's net earnings inures to the benefit of any individual.

Petitioner was formed after the Lehigh Valley Health Planning Council determined that a shared, nonprofit, off-premises laundry would best accommodate the requirements of the member hospitals with respect to both quality of service and economies of scale. The Council had investigated various alternatives. It had rejected a joint service concept because no member hospital had sufficient laundry facilities to serve more than itself. A commercial laundry had declined an offer for the laundry business of all the hospitals, and most of the other available commercial laundries were not capable of managing the heavy total volume.

Petitioner's laundry plant was built and equipped at a cost of about $2 million. This was financed through loans from local banks, with 15-year contracts from 10 of the hospitals used as collateral. Petitioner employs approximately 125 persons.

In 1976, petitioner applied for exemption under § 501 (c)(3) from federal income taxation. The Internal Revenue Service denied the exemption application on the grounds that § 501 (e)[3] of the Code was the exclusive provision under which a

---

[3] Section 501 (e) reads:

"(e) Cooperative hospital service organizations

"For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if—

"(1) such organization is organized and operated solely—

"(A) to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center,

4

cooperative hospital service organization could qualify as "an organization organized and operated exclusively for charitable purposes" and therefore exempt. Because subsection (e)(1) (A) does not mention laundry, the Service reasoned that petitioner was not entitled to tax exemption.

Petitioner duly filed its federal corporate income tax return for its fiscal year ended June 30, 1976. That return showed taxable income of $123,521 and a tax of $10,395. The tax was paid. Shortly thereafter, petitioner filed a claim for refund of that tax and, when the Internal Revenue Service took no action on the claim within six months, see 26 U. S. C. § 6532 (a)(1), petitioner commenced this refund suit in the United States District Court for the Eastern District of Pennsylvania.

On stipulated facts and cross-motions for summary judgment, the District Court ruled in favor of petitioner, holding that it was entitled to exemption as an organization described in § 501 (c)(3). 473 F. Supp. 250 (1979). The United States Court of Appeals for the Third Circuit, however, reversed. It held that § 501 (e) was the exclusive provision under which a cooperative hospital service organization could obtain an income tax exemption, and that the omission of laundry services from § 501 (e)(1)(A)'s specific list of activities demonstrated that Congress intended to deny exempt status to cooperative hospital service laundries. 624 F. 2d 428 (1980).

---

and personnel (including selection, testing, training, and education of personnel) services; and

"(B) to perform such services solely for two or more hospitals each of which is—

"(i) an organization described in subsection (c)(3) which is exempt from taxation under subsection (a),

"(ii) a constituent part of an organization described in subsection (c)(3) which is exempt from taxation under subsection (a) and which, if organized and operated as a separate entity, would constitute an organization described in subsection (c)(3), or

"(iii) owned and operated by the United States, a State, the District of Columbia, or a possession of the United States, or a political subdivision or an agency or instrumentality of any of the foregoing."

Because the ruling of the Court of Appeals is in conflict with decisions elsewhere,[4] we grant certiorari, and we now affirm.

This Court has said: "The starting point in the determination of the scope of 'gross income' is the cardinal principle that Congress in creating the income tax intended 'to use the full measure of its taxing power.'" *Commissioner* v. *Kowalski*, 434 U. S. 77, 82 (1977), quoting from *Helvering* v. *Cliford*, 309 U. S. 331, 334 (1940). See § 61 (a) of the Code, 26 U. S. C. § 61 (a). Under our system of federal income taxation, therefore, every element of gross income of a person, corporate or individual, is subject to tax unless there is a statute or some rule of law that exempts that person or element.

Sections 501 (a) and (c)(3) provide such an exemption, and a complete one, for a corporation fitting the description set forth in subsection (c)(3) and fulfilling the subsection's requirements. But subsection (e) is also a part of § 501. And it expressly concerns the tax status of a cooperative hospital service organization. It provides that such an organization is exempt if, among other things, its activities consist of "data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services." Laundry and linen service, so essential to a hospital's opera-

---

[4] Among the cases in conflict with the Third Circuit's ruling are *Northern California Central Services, Inc.* v. *United States,* 219 Ct. Cl. 60, 591 F. 2d 620 (1979), and *United Hospital Services, Inc.* v. *United States,* 384 F. Supp. 776 (SD Ind. 1974). See also *Chart, Inc.* v. *United States,* 491 F. Supp. 10 (DC 1979) (appeals pending, Nos. 80–1138 and 80–1139 (CADC)).

Decisions in accord with the ruling of the Third Circuit include *Hospital Central Services Assn.* v. *United States,* 623 F. 2d 611 (CA9 1980), cert. denied, *post,* p. 911, and *Metropolitan Detroit Area Hospital Services, Inc.* v. *United States,* 634 F. 2d 330 (CA6 1980). See also *Associated Hospital Services, Inc.* v. *Commissioner,* 74 T. C. 213, 231 (1980) (reviewed by the court, with four dissents; appeal pending, No. 80–3596 (CA5)).

tion, is not included in that list and, indeed, is noticeable for its absence. The issue, thus, is whether that omission prohibits petitioner from qualifying under § 501 as an organization exempt from taxation. The Government's position is that subsection (e) is controlling and exclusive, and because petitioner does not qualify under it, exemption is not available. Petitioner takes the opposing position that § 501 (c) (3) clearly entitles it to the claimed exemption.

Without reference to the legislative history, the Government would appear to have the benefit of this skirmish, for it is a basic principle of statutory construction that a specific statute, here subsection (e), controls over a general provision such as subsection (c)(3), particularly when the two are interrelated and closely positioned, both in fact being parts of § 501 relating to exemption of organizations from tax. See *Bulova Watch Co.* v. *United States,* 365 U. S. 753, 761 (1961).

Additionally, however, the legislative history provides strong and conclusive support for the Government's position. It persuades us that Congress intended subsection (e) to be exclusive and controlling for cooperative hospital service organizations. Prior to the enactment of subsection (e) in 1968, the law as to the tax status of shared hospital service organizations was uncertain. The Internal Revenue Service took the position that if two or more tax-exempt hospitals created an entity to perform commercial services for them, that entity was not entitled to exemption. See Rev. Rul. 54–305, 1954–2 Cum. Bull. 127.[5] See also § 502, as amended, of the 1954 Code, 26 U. S. C. § 502. This position, however, was rejected by the Court of Claims in *Hospital Bureau of Standards and Supplies, Inc.* v. *United States,* 141 Ct. Cl. 91, 158 F. Supp.

---

[5] Since the enactment of subsection (e), the Internal Revenue Service has adhered to its view that laundry service provided by a cooperative hospital service organization is not entitled to exemption under § 501. See Rev. Rul. 69–160, 1969–1 Cum. Bull. 147; Rev. Rul. 69–633, 1969–2 Cum. Bull. 121.

560 (1958). After expressly noting the uncertainty in the law,[6] Congress enacted subsection (e). See Revenue and Expenditure Control Act of 1968, Pub. L. 90–364, § 109 (a), 82 Stat. 269.

In considering the provisions of the tax adjustment bill of 1968 that ultimately became subsection (e), the Senate sought to include laundry in the list of services that a cooperative hospital service organization could provide and still maintain its tax-exempt status. The Treasury Department supported the Senate amendment. See 114 Cong. Rec. 7516, 8111–8112 (1968). At the urging of commercial interests, however (see Hearings on Certain Committee Amendments to H. R. 10612 before the Senate Committee on Finance, 94th Cong., 2d Sess., 608 (1976)), the Conference Committee would accept only a limited version of the Senate amendment. In recommending the adoption of subsection (e), the managers on the part of the House emphasized that shared hospital service organizations performing laundry services were not entitled to tax-exempt status under the new provision. See H. R. Conf. Rep. No. 1533, 90th Cong., 2d Sess., 43 (1968); Senate Committee on Finance and House Committee on Ways and Means, Revenue and Expenditure Control Act of 1968, Explanation of the Bill H. R. 15414, 90th Cong., 2d Sess., 1, 20 (Comm. Print 1968).

Later, in 1976, at the urging of the American Hospital Association, the Senate Committee on Finance proposed an amendment that would have added laundry to the list of services specified in subsection (e)(1)(A). Hearings on H. R. 10612 before the Senate Committee on Finance, 94th Cong., 2d Sess., 2765–2772 (1976); S. Rep. No. 94–938, pt. 2, pp. 76–77 (1976). The amendment, however, was defeated on the floor of the Senate. 122 Cong. Rec. 25915 (1976).

---

[6] See S. Rep. No. 744, 90th Cong., 1st Sess., 200–201 (1967); H. R. Conf. Rep. No. 1030, 90th Cong., 1st Sess., 73 (1967); 114 Cong. Rec. 7516, 8111–8112 (1968).

In view of all this, it seems to us beyond dispute that subsection (e)(1)(A) of § 501, despite the seemingly broad general language of subsection (c)(3), specifies the types of hospital service organizations that are encompassed within the scope of § 501 as charitable organizations. Inasmuch as laundry service was deliberately omitted from the statutory list and, indeed, specifically was refused inclusion in that list, it inevitably follows that petitioner is not entitled to tax-exempt status. The Congress easily can change the statute whenever it is so inclined.[7]

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE WHITE dissents and would set the case for plenary consideration.

JUSTICE STEVENS, dissenting.

Today the Court summarily decides that § 501, read in light of the legislative history of § 501 (e), requires that nonprofit cooperative hospital laundries be denied an exemption from federal income tax, even though they may satisfy the requirements of §§ 501 (a) and 501 (c)(3). In my opinion, the Court's summary disposition is ill-advised because a full understanding of the question presented in this case requires an examination of the history underlying the present state of the law with respect to the tax status of cooperative hos-

---

[7] We do not agree with the suggestion made by the Court of Claims in *Northern California Central Services, Inc.* v. *United States*, 219 Ct. Cl., at 67, 591 F. 2d, at 624, that Congress "may have wished not to encourage cooperative hospital laundries by new tax exemptions, to which commercial laundries made vehement objections, yet to leave such laundries free to obtain from the courts the exemptions that existing law might afford them." The extended hearings, the Committee considerations, and the floor debates all reveal that Congress was well informed on the issue and made a deliberate decision. We necessarily recognize that congressional choice.

pital service organizations. When the statute is read against that background—indeed, even when it is read in isolation—its plain language unambiguously entitles this petitioner to an exemption.

I

In 1950, Congress amended § 101 of the Internal Revenue Code of 1939 by adding to that section a paragraph dealing with so-called "feeder organizations." Revenue Act of 1950, § 301 (b), Pub. L. 814, ch. 994, 64 Stat. 953. This paragraph was subsequently reenacted without substantial change as § 502(a) of the Internal Revenue Code of 1954.[1] In 1952, the Treasury Department adopted a regulation designed to implement the feeder provision of § 101. Treas. Regs. 111, § 29.101–3 (b).[2] Although this regulation did not specifi-

---

[1] Section 502 (a) provides:

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt from taxation under section 501 on the ground that all of its profits are payable to one or more organizations exempt from taxation under section 501." 26 U. S. C. § 502 (a).

[2] The feeder regulation was subsequently redesignated Treas. Regs. 118, § 39.101–2 (b) (1953). This regulation, insofar as relevant to this case, appears substantially in its original form as Treas. Reg. § 1.502–1 (b), 26 CFR § 1.502–1 (b) (1980). It provides, in pertinent part:

"If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization

cally address cooperative hospital service organizations, it did indicate that the Treasury considered cooperative ventures operated by tax-exempt entities for the purpose of providing necessary services to those entities nonexempt feeder organizations.[3]

The Internal Revenue Service first applied this regulation to cooperative hospital service organizations in a 1954 Revenue Ruling, Rev. Rul. 54–305, 1954–2 Cum. Bull. 127. In that Ruling, the Service held that a corporation organized and operated for the primary purpose of operating and maintaining a purchasing agency for the benefit of its members—tax-exempt hospitals and other charitable institutions—fell within the feeder regulation and thus was not entitled to an income tax exemption. The corporation at issue realized substantial

---

(and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations."

[3] These cooperative ventures apparently were considered feeder organizations whether or not they were operated for the purpose of generating profits. Despite the fact that the governing statute, § 502 (a), is applicable only to organizations "operated for the primary purpose of carrying on a trade or business for profit," the implementing regulation, § 1.502–1 (b), does not mention the "for profit" requirement. In several cases rejecting the Treasury's contention that cooperative hospital service organizations are nonexempt feeders, the courts have emphasized the Treasury's failure to take into account the "for profit" requirement of the statute. See, e. g., *Hospital Bureau of Standards & Supplies, Inc.* v. *United States,* 141 Ct. Cl. 91, 95–96, 158 F. Supp. 560, 563–564 (1958); *Hospital Central Services Assn.* v. *United States,* 40 AFTR 2d 77–5646, 77–5648 (WD Wash. 1977); *Community Hospital Services, Inc.* v. *United States,* 43 AFTR 2d 79–934, 79–939 to 79–940 (ED Mich. 1979); 473 F. Supp. 250, 254–255 (ED Pa. 1979) (case below); *Associated Hospital Services, Inc.* v. *Commissioner,* 74 T. C. 213, 234–235 (1980) (Tannenwald, J., dissenting), appeal pending, No. 80–3596 (CA5).

profits from its operations and distributed only ·a portion of those profits to its members. *Ibid.* Accordingly, the Service found that the corporation was operated for the primary purpose of carrying on a trade or business for profit within the meaning of § 101 of the 1939 Code. This Revenue Ruling, and the regulation on which it was based, are the sources of the Treasury's pre-1968 position that cooperative hospital service organizations were not entitled to tax-exempt status.

The first judicial consideration of this position came in 1958 in *Hospital Bureau of Standards & Supplies, Inc.* v. *United States,* 141 Ct. Cl. 91, 158 F. Supp. 560.[4] In that case, a group of nonprofit, tax-exempt hospitals formed a nonprofit corporation to act as their joint purchasing agent and to perform certain research functions on their behalf. The corporation brought suit against the Government to recover income taxes assessed for 1952 and 1953, alleging that it was entitled to a tax exemption under § 101 (6) of the 1939 Code, the predecessor of present § 501 (c)(3). The Government opposed the claimed exemption, arguing primarily that the corporation was a feeder organization under Treas. Regs. 118, § 39.101–2 (b) (1953). The Court of Claims held that the feeder provision was inapplicable in that case because the corporation was not organized and operated for the primary purpose of carrying on a trade or business for profit as required by the statute, even though it had reported net income for the two tax years in question. 141 Ct. Cl., at 95–96, 158 F. Supp., at 563–564. Accordingly, the court ruled that the corporation was entitled to a tax exemption under § 101 (6).[5]

---

[4] Justice Stanley Reed, then recently retired from service on this Court, sat by designation as a member of the Court of Claims in the *Hospital Bureau* case.

[5] The Commissioner never expressly announced a nonacquiescence in this decision. However, in an apparent response to the *Hospital Bureau* case, the feeder regulation, § 1.502–1 (b), was amended in several respects in 1963. See T. D. 6662, 1963–2 Cum. Bull. 214, 215–216. See also *Associated Hospital Services, Inc.* v. *Commissioner, supra,* at 219.

12

Almost 10 years passed before the next important development in this area. In 1967, in connection with the Social Security Amendments of 1967, the original version of § 501 (e) was proposed as an amendment to § 501. The proposed amendment provided that a cooperative hospital service organization would be exempt from income taxation as long as it satisfied certain requirements, among them a requirement that it perform only services which, if performed by the member hospitals themselves, would constitute an integral part of their exempt activities. See S. Rep. No. 744, Social Security Amendments of 1967, Report of the Senate Committee on Finance, 90th Cong., 1st Sess., 201–202, 318–319 (1967). The legislative history indicates that laundry services were considered within the scope of the proposed amendment. *Id.*, at 201. The legislative history also indicates that Congress was aware of the Treasury's belief that such cooperative ventures were not tax exempt because of the Code's feeder provision. *Id.*, at 200–201.[6] However, the Senate Report noted as well that the Court of Claims in *Hospital Bureau*, "the leading case in point," had rejected the Treasury's position. S. Rep. No. 744, at 201, and n. 1.

The proposed amendment was not accepted by the House in its original form. See H. R. Conf. Rep. No. 1030, 90th Cong., 1st Sess., 73 (1967). Rather, during 1968, § 501 (e) in

---

[6] Under the heading "Present law," the Senate Report contains the following statement:

"If two or more tax-exempt hospitals join together in creating an entity to perform services for the hospitals, the Internal Revenue Service takes the position that the entity constitutes a 'feeder organization' and is not entitled to income tax exemption because of a special provision of the code applicable to such organizations. This is true even though the service performed, if performed by each of the hospitals individually, would be considered an integral part of their exempt activities. In spite of this position of the Service, the leading case in point held such an entity furnishing services to hospitals to be exempt from tax." S. Rep. No. 744, at 200–201.

its present form was enacted into law as part of the Revenue and Expenditure Control Act of 1968.[7] The 1968 legislative history is set forth in adequate detail in the majority opinion, *ante,* at 6–7, and in the opinion of the Court of Appeals, 624 F. 2d 428, 433–434 (CA3 1980), and does not warrant repetition here.[8] As I read that legislative history, it establishes that Congress deliberately omitted laundry services

---

[7] Section 501 (e) provides, in pertinent part:

"For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if—

"(1) such organization is organized and operated solely—

"(A) to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services; and

"(B) to perform such services solely for two or more hospitals each of which is—

"(i) an organization described in subsection (c)(3) which is exempt from taxation under subsection (a),

"(ii) a constituent part of an organization described in subsection (c)(3) which is exempt from taxation under subsection (a) and which, if organized and operated as a separate entity, would constitute an organization described in subsection (c)(3), or

"(iii) owned and operated by the United States, a State, the District of Columbia, or a possession of the United States, or a political subdivision or an agency or instrumentality of any of the foregoing;

"(2) such organization is organized and operated on a cooperative basis and allocates or pays, within 8½ months after the close of its taxable year, all net earnings to patrons on the basis of services performed for them; and

"(3) if such organization has capital stock, all of such stock outstanding is owned by its patrons." 26 U. S. C. § 501 (e).

[8] See also *Metropolitan Detroit Area Hospital Services, Inc.* v. *United States,* 634 F. 2d 330, 334–335 (CA6 1980).

from § 501 (e) and clearly intended that joint hospital laundries not be entitled to claim an income tax exemption under § 501 (e). These conclusions are reinforced by Congress' rejection in 1976 of a proposed amendment to § 501 (e) that would have added laundry services to that subsection's list of eligible services. See *ante*, at 7.

Despite the enactment of § 501 (e) in 1968, it was not until 1980 that a federal court decided that nonprofit cooperative hospital laundries were not entitled to an income tax exemption under § 501.[9]   Between 1968 and 1980, six federal courts rejected the Treasury's contention that hospital service organizations providing services other than those listed in § 501 (e) were not entitled to claim an exemption under § 501 (c) (3).[10]   These courts also rejected the Treasury's alternative contention that, even if such entities were not automatically excluded from consideration under § 501 (c)(3), they nonetheless were nonexempt feeder organizations under § 502 (a) and Treas. Reg. § 1.502–1 (b). In 1980, however, three Courts of Appeals concluded that § 501 (e) provides the ex-

---

[9] The Internal Revenue Service, shortly after enactment of § 501 (e), ruled that § 501 (e) did not provide an exemption for hospital service organizations that performed laundry services. Rev. Rul. 69–160, 1969–1 Cum. Bull. 147. The Service also ruled that because laundry services were not among those listed in § 501 (e), a joint hospital laundry service could not claim a tax exemption under § 501 (c)(3). Rev. Rul. 69–633, 1969–2 Cum. Bull. 121.

[10] See *United Hospital Services, Inc.* v. *United States*, 384 F. Supp. 776 (SD Ind. 1974); *Hospital Central Services Assn.* v. *United States*, 40 AFTR 2d 77–5646 (WD Wash. 1977); *Metropolitan Detroit Area Hospital Services, Inc.* v. *United States*, 445 F. Supp. 857 (ED Mich. 1978); *Northern California Central Services, Inc.* v. *United States*, 219 Ct. Cl. 60, 591 F. 2d 620 (1979); *Community Hospital Services, Inc.* v. *United States*, 43 AFTR 2d 79–934 (ED Mich. 1979); 473 F. Supp. 250 (ED Pa. 1979) (case below). See also *Chart, Inc.* v. *United States*, 491 F. Supp. 10 (DC 1979), appeal pending, Nos. 80–1138, 80–1139 (CADC), in which the District Court held that an organization that qualifies for exemption under § 501 (e) may nonetheless also claim the broader exemption provided by § 501 (c)(3).

clusive means by which a hospital service organization may acquire an income tax exemption.[11]   These courts relied primarily upon the 1968 and 1976 legislative history cited by the majority.   The decision of the Third Circuit, the first in this series of Court of Appeals decisions, is presently before us.

## II

In the District Court in this case, the Government argued, as it had on five previous occasions, that because Congress deliberately omitted hospital laundries from § 501 (e), it necessarily followed that they also were outside the scope of § 501 (c)(3).   See 473 F. Supp. 250, 252 (ED Pa. 1979).   The District Court rejected this argument, choosing instead to align itself with the then-unbroken line of precedent.   *Id.*, at 253–254.[12]   The District Court also rejected the Government's alternative argument based upon § 502 (a).   On appeal, the Government abandoned this argument, see 624 F. 2d, at 432, n. 6, and relied solely upon § 501 (e).[13]   Thus, as

---

[11] See 624 F. 2d 428 (CA3 1980) (case below); *Hospital Central Services Assn.* v. *United States,* 623 F. 2d 611 (CA9 1980), cert. denied, *post,* p. 911; *Metropolitan Detroit Area Hospital Services, Inc.* v. *United States, supra.*

In *Associated Hospital Services, Inc.* v. *Commissioner,* 74 T. C. 213 (1980), appeal pending, No. 80–3596 (CA5), a sharply divided Tax Court held that a nonprofit cooperative hospital laundry was not entitled to tax exemption under § 501, because of the feeder regulation, Treas. Reg. § 1.502–1 (b).   However, as explained in note 13, *infra,* the Tax Court's reasoning is in conflict with that in the above-cited cases and, in fact, supports the position of the petitioner in the instant case.

[12] See cases cited in note 10, *supra.*

[13] In *Associated Hospital Services, Inc.* v. *Commissioner, supra,* the Tax Court, over the dissent of four judges, accepted the Government's argument that the hospital laundry cooperative was a "feeder organization" under § 502 and Treas. Reg. § 1.502–1 (b) and therefore nonexempt.   For the reasons stated in the dissenting opinions of Judge Tannenwald and Judge Wilbur, I disagree with that decision.   What is significant about the Tax Court's holding, however, is that even the majority did not accept the

shaped by the proceedings below, the question presented here is whether Congress, in enacting § 501 (e), intended that cooperative hospital service organizations must qualify for tax exemption under that statute or not at all. The Court concludes that the statutory language and legislative history require an affirmative answer to that question. Neither factor, in my judgment, supports the Court's conclusion.

### A

Correct analysis of the income tax exemption provisions at issue in this case should focus upon the language of the statutory provision which actually creates the exemption. That provision is § 501 (a), which states:

"An organization described in subsection (c) or (d) or section 401 (a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503." 26 U. S. C. § 501 (a).

This language is clear and unambiguous. Insofar as relevant in this case, it provides that organizations meeting the requirements of § 501 (c)(3) shall be exempt from the federal income tax.[14] Such organizations are to be denied exemption

Government's present contention that § 501 (e) precludes any tax exemption for a laundry cooperative *even if it is not a feeder organization under § 502*. The Tax Court observed that laundry services had been intentionally omitted from § 501 (e), but nonetheless went on to consider § 502 (a) and Treas. Reg. § 1.502–1 (b). This inquiry would have been wholly unnecessary if, as the Government argues in this case, hospital service organizations not listed in § 501 (e) are not entitled to claim an exemption under § 501 (c)(3). For, as explained in Part II–A, *infra*, § 502 operates to deny a tax exemption to certain organizations which otherwise would be entitled to exemption under § 501 (c)(3).

[14] Section 501 (c) provides, in pertinent part:

"The following organizations are referred to in subsection (a):

.　　　　.　　　　.　　　　.　　　　.

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster na-

only if they fall within the provisions of §§ 502 or 503. Section 501 (a) contains no reference to § 501 (e), nor does § 501 (c)(3) indicate that it is in any way limited by § 501 (e).

Applying this plain statutory language to the facts of this case, it is clear that, but for § 501 (e), petitioner is entitled to a tax exemption under §§ 501 (a) and 501 (c)(3). It is undisputed that petitioner satisfies the requirements of § 501 (c)(3).[15] Therefore, under § 501 (a) petitioner is exempt from taxation unless one of the two express exceptions identified in that subsection applies. The District Court found § 502 inapplicable because petitioner was not operated on a "for profit" basis. 473 F. Supp., at 254–255. This finding has not been challenged by the Government. Section 503 is simply irrelevant in this case. Therefore, the plain language of the relevant statutes clearly states that petitioner is a tax-exempt organization.

The majority overrides this plain statutory language by construing § 501 (e) as an exception to the broad charitable

---

tional or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." 26 U. S. C. § 501 (c)(3).

[15] After rejecting the Government's contention that § 501 (e) controlled this case, the District Court found that petitioner is a charitable organization within the meaning of § 501 (c)(3). 473 F. Supp., at 254. Although it reversed the District Court's decision, the Court of Appeals did not disturb this finding. Rather, it concluded that petitioner was not entitled even to attempt to qualify for an income tax exemption under § 501 (c)(3), because § 501 (e) exclusively governs the tax status of cooperative hospital service organizations. Thus, the Court of Appeals considered its inquiry ended once it was established that petitioner provided a service not listed in § 501 (e).

exemption created by §§ 501 (a) and 501 (c)(3). Construed in this manner, § 501 (e) operates to deny a tax exemption to organizations that otherwise satisfy the express statutory requirements for exemption. The § 501 (e) exception itself, however, is not express: rather than identifying particular organizations as nonexempt, § 501 (e) identifies particular organizations as exempt and, apparently by implication, denies all similar but unlisted organizations the exemption otherwise available under §§ 501 (a) and 501 (c)(3).

The Court silently dismisses the fact that §§ 501 (a) and 501 (c)(3) contain no reference indicating that § 501 (e) is to have this limiting effect; the necessary connection between the statutes is supplied instead by the Court's finding that § 501 (e) is "interrelated" with and "closely positioned" to § 501 (c)(3). *Ante,* at 6. It cannot be denied that § 501 (e) is close in position to § 501 (c)(3). But a statute's text is surely more significant than its physical location.[16] And to state, as the majority does, that §§ 501 (c)(3) and 501 (e) are "interrelated" is to substitute conclusion for analysis. Apart from their proximity to one another, the only express relationship between these statutes is that certain entities described in § 501 (e) are to be treated as charitable organizations under § 501 (c)(3) for federal income tax purposes. Nothing in any of the relevant statutes suggests that § 501 (e) is to have the effect of denying an exemption to organizations that satisfy the requirements of § 501 (c)(3). When Congress wanted a statute to have such an effect, it had no difficulty making its intention unmistakably plain, as is evident from § 501 (a)'s reference to §§ 502 and 503. The language Congress em-

---

[16] If Congress, in a wholly separate section of the Tax Code, had clearly stated that all hospital service organizations except those specifically enumerated shall be denied income tax exemption, the Court would not decline to give that statute effect merely because it was not a part of § 501. Similarly, in this case it seems to me that § 501 (e)'s position cannot take the place of a congressional declaration that certain organizations be denied tax exemption.

ployed in § 501 (e) reflects an intention to enlarge, not to reduce, the category of organizations entitled to exemption under § 501 (c)(3).[17]

## B

The Court supports its interpretation of § 501 with a discussion of legislative history. However, this discussion makes no reference to the legislative history of the statutory provisions primarily at issue in this case, §§ 501 (a) and 501 (c) (3). Instead, the Court focuses upon the legislative history of § 501 (e). In my opinion, insofar as the Court relies upon this legislative history, its decision rests upon a non sequitur. Because the text and legislative history of § 501(e), which was enacted in 1968, persuade the Court that petitioner is not entitled to an exemption under that section, the Court concludes that petitioner also is not entitled to claim exemption under § 501 (c)(3), which was enacted in 1954.[18] Unless the later statute limited the scope of the earlier statute, the conclusion is not supported by the premise.

The legislative history of § 501 (e) might support the Court's position if it unambiguously revealed: (1) that Congress in 1968 believed that no cooperative hospital service organization could satisfy the requirements of § 501 (c)(3) and it therefore enacted § 501 (e) to extend a tax exemption to certain entities previously not entitled to exemption; or (2) that Congress in 1968 believed that cooperative hospital

---

[17] Indeed, several courts have specifically concluded that § 501 (e) was intended to expand, not to contract, the category of organizations eligible for tax exemption under § 501 (c)(3). See, e. g., *Northern California Central Services, Inc.* v. *United States,* 219 Ct. Cl., at 67, 591 F. 2d, at 624; 473 F. Supp., at 253; *Metropolitan Detroit Area Hospital Services, Inc.* v. *United States,* 445 F. Supp., at 860; *United Hospital Services, Inc.* v. *United States,* 384 F. Supp., at 781.

[18] In fact, § 501 (c)(3) had as its predecessor § 101 (6) of the Internal Revenue Code of 1939. However, for purposes of the analysis in the text, the precise point of origin of § 501 (c)(3) is unimportant; it is sufficient that § 501 (c)(3) was enacted well before § 501 (e).

service organizations were at least arguably entitled to tax exemption under § 501 (c)(3) and it enacted § 501 (e) to withdraw this exemption from some, but not all, of these entities. The legislative history provides persuasive support for neither proposition.

In my opinion, § 501 (e) unambiguously granted a tax exemption to certain entities that arguably already were entitled to an exemption under § 501 (c)(3). There is absolutely no evidence that the 1968 statute was intended to withdraw any benefits that were already available under the 1954 Act. Proper analysis, therefore, should focus on the question whether petitioner would have been entitled to an exemption under pre-1968 law.

The 1954 Act created a broad category of exempt organizations, including corporations "operated exclusively for . . . charitable . . . purposes." That hospitals could qualify for exemption has always been clear. The question whether a cooperative organization formed by a group of tax-exempt hospitals to provide services for the hospitals could also qualify for exemption was less clear. As discussed in Part I, *supra,* prior to 1968 the Treasury took the position that such a cooperative was a "feeder organization" within the meaning of § 502 of the Code.[19] This position, however, was rejected by the Court of Claims which—quite properly in my opinion—held that such a cooperative was not a "feeder" and was exempt under what is now § 501 (c)(3). See *Hospital Bureau of Standards & Supplies, Inc.* v. *United States,* 141 Ct. Cl. 91, 158 F. Supp. 560 (1958).

As a matter of history—presumably because cooperative service organizations were fairly common in the hospital in-

---

[19] According to the Treasury, hospital cooperatives were denied tax exemption, not because they failed to satisfy the requirements of § 501 (c)(3), but because, in the Treasury's judgment, they were feeder organizations and thus within an express exception to the charitable exemption provisions. See Rev. Rul. 54–305, 1954–2 Cum. Bull. 127; Treas. Reg. § 1.502–1 (b).

dustry—the § 502 issue arose in disputes between the Treasury Department and hospital affiliates. Conceptually, however, there is no reason why the identical issue could not arise if other tax-exempt entities, such as schools or churches, might find it advantageous to form cooperatives to perform some of their essential functions for them.[20] In any event, when the issue was brought to the attention of Congress in 1967 and 1968, the focus of the dispute still concerned hospital affiliates. Congress then made an unequivocal policy choice rejecting the position of the Treasury and granting an unambiguous exemption to cooperative hospital service organizations performing certain described functions.[21] Nothing in the 1968 legislation explicitly or implicitly qualified the exemption previously available under § 501.[22]

---

[20] Indeed, in its feeder regulation the Treasury clearly indicated that its opposition to tax exemption for cooperative service organizations was not limited to hospital cooperatives, but rather extended to all cooperative service organizations formed by two or more tax-exempt entities. See Treas. Reg. § 1.502–1 (b).

[21] It seems clear from the legislative history that Congress was aware that cooperative hospital service organizations were at least arguably entitled to exemption prior to 1968. Several passages in the legislative history indicate that Congress knew that the Treasury believed that such organizations were not entitled to exemption; nothing in the legislative history suggests that Congress approved of this position. See S. Rep. No. 744, 90th Cong., 1st Sess., 200–201 (1967); 114 Cong. Rec. 7516 (1968); id., at 8112. Congress also was aware that the Treasury's position was based primarily upon § 502 (a), rather than § 501 (c) (3), and that its position had been rejected by "the leading case in point." See supra, at 12.

[22] In fact, since the Treasury's opposition to tax-exempt status for hospital service organizations was based on § 502, rather than § 501 (c) (3), it is more reasonable to construe the enactment of § 501 (e) as a congressional attempt to limit § 502, rather than § 501 (c) (3). Some of the language of § 501 (e) supports this view. For example, § 501 (e) (2) provides that a cooperative hospital service organization qualifying for exemption under that subsection must allocate or pay to its members all net earnings within 8½ months after the close of its taxable year. Section

Section 501 (e) does not confer an exemption on cooperative educational or religious service organizations.[23] If such organizations would previously have been exempt under § 501 (c)(3), should the 1968 Act be construed to have withdrawn the exemption by reason of the fact that Congress saw fit to confine the benefit of its clarifying amendment to "cooperative hospital service organizations"? I think the answer is clear and that the same answer should apply to a hospital cooperative that is not expressly covered by the 1968 Act. Its tax status should be evaluated on the basis of the remaining relevant provisions of the Internal Revenue Code.

502, which was the congressional response to the series of "destination of income" cases culminating in the famous case involving the New York University School of Law's noodle factory, *C. F. Mueller Co.* v. *Commissioner,* 190 F. 2d 120 (CA3 1951), was directed precisely at organizations which funneled their net income to tax-exempt institutions. Thus, organizations which might otherwise reasonably be considered feeder organizations are entitled to exemption under § 501 (e). However, there is no reason why a cooperative organization that operates on a nonprofit basis and does not funnel earnings back to its members, such as the petitioner in this case, cannot qualify for an income tax exemption under § 501 (c)(3). Such an organization, deprived of the shield of § 501 (e), should nonetheless be tax exempt if it can avoid challenge as a feeder on its own merits.

The conclusion that § 501 (e) was designed as a shield for certain organizations that otherwise would be considered nonexempt feeders is also supported by the fact that the exemption available under § 501 (e) is more restrictive than that available under § 501 (c)(3). As the District Court in *Chart, Inc.* v. *United States,* 491 F. Supp. 10 (DC 1979), appeal pending, Nos. 80–1138, 80–1139 (CADC), observed, organizations which qualify for tax exemption under § 501 (c)(3) are able to operate with a great deal more flexibility than those qualifying under § 501 (e). *Id.,* at 13–14. Congress may well have designed § 501 (e) to provide a limited form of tax exemption for previously nonexempt feeder organizations.

[23] Section 501 (f) is entitled "Cooperative service organizations of operating educational organizations," but it is not analogous to § 501 (e). Section 501 (f) concerns organizations organized and operated to invest funds on behalf of educational institutions and to pay the resulting income to these institutions.

I recognize that both in 1968 and in 1976 attempts were made to extend the explicit § 501 (e) exemption to encompass hospital laundry cooperatives and that these attempts were rejected. This legislative history proves nothing more than what is already plainly stated in the statute itself: the § 501 (e) exemption is not available to petitioner. That is equally true of a cooperative educational service organization. But that fact does not evidence any intent by Congress to withdraw whatever exemption would be available to such organizations under other provisions of the Code.

Nor does logic compel the conclusion that Congress intended to withdraw a pre-existing exemption. As a matter of tax policy, nothing that I have read provides any obvious legitimate basis for giving hospital service organizations more favorable treatment than other charitable service organizations, or for giving a data processing or food service organization better treatment than a laundry service organization. Furthermore, I cannot accept the kind of reasoning—which unfortunately may characterize our summary dispositions— that interprets a statute that was plainly intended to do nothing more than extend a certain benefit to some taxpayers as though it were intended to withdraw a benefit otherwise available to other taxpayers.

I respectfully dissent.